IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LESLIE KELLY,
        PLAINTIFF

Civil Action No. 03-368

v.

Judge McLaughlin
Magistrate Judge Baxter

JOHN LAMANNA, ET AL.,
        DEFENDANTS

**DECLARATION OF STEPHEN HOUSLER, SAFETY MANAGER**

1. I am a Safety Manager employed by the United States Department of Justice, Federal Bureau of Prisons (BOP), and assigned to the Federal Correctional Institution in McKean, Pennsylvania (FCI McKean). I have held my current position since August 7, 1994.

2. As the Safety Manager at FCI McKean, I manage a multifaceted safety, environmental, fire and sanitation program for the facility. I am responsible for providing a safe and healthful environment for all staff and inmates within the correctional facility. I advise and assist management in the development and implementation of safety and occupational health policies. I also lead all employees at FCI McKean in safety activities and assist employees and inmates in carrying out effective safety programs and

practices.

3. Additionally, I issue safety instructions, policies, and procedures to meet the needs of FCI McKean. I supervise fire prevention and control programs. I also investigate accidents involving staff and inmates, and conduct follow-up investigations to obtain necessary information relative to compensation or disability claims. I also maintain statistical data for determining injury/accident trends. I evaluate program effectiveness and take necessary corrective action to reduce accidents/injuries.

4. As a Safety Manager, I also conduct inspections of all areas, buildings, structures and operations to detect any hazards in work operations and ensure conformance with safety rules, standards, and regulations. I gather results of inspections, and communicate required corrective actions to all department heads within the facility. I serve as a technical advisor to the Associate Warden in all matters pertaining to personal protective equipment, machine guarding, hazardous waste, toxic and flammable substance control, asbestos abatement, accident and injury investigation, employee and inmate compensation claims and procedures, fire prevention and protection, insect and

rodent control, and sanitation.

5. Furthermore, as a Safety Manager I have knowledge of occupational safety, environmental health, environmental protection, fire protection, industrial hygiene, life safety, pest control, worker's compensation laws and procedures, and institution sanitation procedures. I develop new methods and approaches and procedures in the safety and occupational health and environmental areas. I am familiar with Federal Bureau of Prisons' policies, procedures and regulations as well as with safety procedures for staff and inmate workers. I am responsible for planning, designing and implementing the entire safety program for the institution.

6. I am aware that inmate Leslie Kelly, Register Number 26864-039, filed a civil rights action, in which he alleges that I violated his Constitutional rights as a result of the conditions in the Federal Prison Industries, Inc. (FPI or trade name UNICOR) factory at FCI McKean.

7. Specifically, he alleges that the air quality in UNICOR does not meet the standards established by the Occupational Safety and Health Administration (OSHA); and that the

Material Safety Data Sheet (MSDS) were altered.

8. On July 3, 2001, FCI McKean received a letter and telephone call from the Occupational Safety and Health Administration (OSHA) indicating that they had received a notice of a safety or health hazard in the UNICOR factory. They did not indicate from whom the complaint originated, nor did they provide a copy of the complaint. **Attachment A is a true and correct copy of the notice received by the institution from OSHA, dated July 3, 2001.**

9. The letter from OSHA referenced two specific allegations: 1) that the UNICOR factory was not adequately ventilated, and employees are exposed to excessive wood dust; and 2) that dust masks are not readily available. **See Attachment A.**

10. The letter from OSHA indicated that they had not made any determination as to whether the alleged hazards existed, and did not intend to conduct any further investigation. Nonetheless, OSHA did request that FCI McKean investigate the allegations and make any necessary corrections or modifications. **See Attachment A.**

11. The Warden responded to OSHA's concerns on July 27, 2001.

In that letter, he described the current dust collection system in place in the UNICOR factory and indicated that dust masks are available in the UNICOR tool room, and are issued upon request. He further indicated that Microbac Laboratories had been contacted to conduct independent air quality testing in the UNICOR factory. **Attachment B is true and correct copy of the response sent by Warden LaManna, dated July 27, 2001.**

12. On July 31, 2001, Microbac Laboratories conducted air quality testing in the UNICOR factory. The permissible level of total particulates in the air, according to OSHA standards, is 15.0 mg/cubic meter and 5.0 mg/cubic meter for nuisance dust. The test results showed that the air quality in the UNICOR factory was well within the permissible limits established by OSHA. **Attachment C is a true and correct copy of the air quality test results received from Microbac Laboratories.**

13. Specifically, the test showed that the highest measurable amount of total particulates in any of the six areas tested was 0.3 mg/cubic meter. Again, the maximum allowable level is 15 mg/cubic meter. Likewise, the highest measurement for respirable nuisance dust was 0.4 mg/cubic meter. Again, the

maximum allowable level is 5.0 mg/cubic meter. **See Attachment C.**

14. The second interaction between the UNICOR factory at FCI McKean and OSHA occurred on April 14, 2003, when OSHA issued a Notice of Alleged Safety or Health Hazards to FCI McKean. **Attachment D is a true and correct copy of the April 14, 2003, Notice of Alleged Safety or Health Hazard.**

15. The OSHA notice alleged that the ventilation in the UNICOR factory was inadequate to control the hazards associated with dusts generated during the production processes. The dusts included wood dust, particle board dust and Micoreboard dust. The Notice also alleged that the ventilation was inadequate to control the hazards associated with vapors that were produced by glues utilized in the laminating processes. **See Attachment D.**

16. On or about Wednesday, April 16, 2003, a compliance officer from OSHA visited the UNICOR factory at FCI McKean and conducted a walk-through inspection. At the conclusion of the walk-through, the OSHA inspector gave me a verbal indication that he found no evidence of concern related to the air quality in the factory, and that all appropriate and

necessary practices were being followed in accordance with OSHA regulations  The inspector indicated that OSHA inspectors would return to the UNICOR factory to conduct a formal inspection.

17. On May 14, 2003, the OSHA Compliance Officer conducted an inspection of the UNICOR factory.  On June 17 and 18, 2003, representatives from OSHA returned to FCI McKean to conduct an air monitoring of the UNICOR factory.  On or about June 18, 2003, after the air monitoring inspection, the OSHA Industrial Hygienist told me that the air monitoring had gone well, and he did not foresee any violations with respect to the air quality in the UNICOR factory.

18. In a letter dated August 20, 2003, OSHA informed FCI McKean that no OSHA standard applied to the alleged hazards, and no OSHA citation would be issued for the alleged hazards.  The letter included results of the OSHA air monitoring, which had evaluated worker exposures to airborne dust concentrations of vitreous fiber and perlite.  The results showed that no worker's exposure exceeded 10% of the relevant exposure limit.  Notably, respirable silica dust was not detected by OSHA inspectors in the areas of the factory where silica was present in the greatest

concentration. Thus, OSHA concluded that inmate Kelly, and other inmates assigned to the UNICOR factory, were not exposed to inappropriate levels of contaminants in the UNICOR factory. **Attachment E is a true and correct copy of the letter sent to FCI McKean by OSHA.**

19. Also, between April 16, 2003, and August 1, 2003, OSHA inspectors evaluated the entire UNICOR factory and the FCI McKean prison compound, and on August 20, 2003, a Notice of Unsafe or Unhealthful Working Conditions was issued. **Attachment F is a true and correct copy of the Notice of Unsafe or Unhealthful Working Conditions.**

20. Although the OSHA Notice discussed numerous issues, the only cited OSHA violation which is relevant to this complaint regarding hazardous substances in the UNICOR factory air was described as, "Adequate precautions against the ignition of flammable vapors were not taken." Specifically, this section discussed the use of Lokweld spray adhesive in the UNICOR factory. **See Attachment F. Attachment G is a true and correct copy of the Material Safety Data Sheet for Lokweld 860/861 Spray Grade Adhesive.**

21. Lokweld 860/861 (Lokweld) is a spray grade adhesive used in

the UNICOR factory at FCI McKean. Lokweld is applied to materials in the UNICOR factory by using a sprayer which is located in an enclosed spraying booth, with its own independent exhaust system.

22. The booth in which Lokweld is used is a completely enclosed unit. No leaks or other hazards have been identified. Furthermore, if a leak did form, the vapors emanating from the booth would have a noxious and easily identifiable odor. I have been through the UNICOR factory on numerous occasions and I have never noticed any unusual odors in or around the Lokweld spray station. Additionally, I have never received any complaints about odors or vapors in or around the Lokweld station.

23. From April 16, 2003 through August 1, 2003, an inspection of the UNICOR factory was conducted by OSHA personnel. This inspection included a full inspection of the Lokweld spray booth. **See Attachment F.**

24. Although OSHA noted several concerns related to the manner in which Lokweld was utilized by the institution. All of these concerns related to the combustibility and flammability of Lokweld. At no time during its inspection

did OSHA note any concerns relating to Lokweld fumes emanating from the spray booth. **See Attachment F.**

25. Additionally, the OSHA inspection did not indicate that the spraying booth had improper ventilation or that inadequate protection was offered against fumes emitting from the Lokweld. **See Attachments E and F.**

26. On the Material Safety Data Sheet (MSDS) sheet provided by the manufacturer, it indicates that goggles, an apron and gloves should be utilized when handling Lokweld adhesive. There is no indication that a respirator is required. In fact, it specifically indicates that a respirator is not required unless there is insufficient ventilation. Again, the OSHA inspection found that there were no concerns with respect to the ventilation system utilized in the UNICOR factory with respect to Lokweld. **See Attachments F and G.**

27. Additionally, on the day of the inspection, one inmate was using Lokweld in an unsafe and unauthorized manner to glue two boards by hand in the factory. Again, this is not an approved use of Lokweld and, to the best of my knowledge, this action was not sanctioned by the institution or UNICOR staff. I have no personal knowledge as to whether this

inmate was disciplined for this activity.

28. In my experience, as the Safety Manager, I have never personally noticed or had any other staff or inmate bring to my attention, any concerns relating to fumes or vapors leaking out of the Lokweld spraying booth.

29. By letter dated September 22, 2003, Warden LaManna informed OSHA that FCI McKean had taken corrective measures regarding all of the identified Unsafe Working Conditions, with four exceptions, which were awaiting additional information from the Bureau of Prisons Central Office. **Attachment H is a true and correct copy of the abatement letter dated September 22, 2003.**

30. Specifically, Warden LaManna's letter advised OSHA that by April 25, 2003, LokWeld glue and the fire cabinet were removed from the Special Projects Area. The Warden advised that LokWeld would no longer be used in making their products. **See Attachment H.**

31. In addition to his concerns with Lokweld, inmate Kelly further alleges he was provided with an inadequate respirator when he was working with or exposed to Micore

Mineral Fiber Board (Micore).

32. It is clear from the Material Safety Data Sheet (MSDS) that UNICOR was not required to provide inmate Kelly with a respirator when he was working with or around Micore. Specifically, the MSDS sheet indicates that respiratory protection is, "not typically necessary under normal conditions of use." **Attachment I is a true and correct copy of the Micore MSDS sheet.**

33. An MSDS is a technical bulletin prepared by chemical manufacturers and importers to supplement the information contained on product labels. Pursuant to the Hazard Communication Standard ("HCS") promulgated by OSHA, chemical manufacturers and importers must evaluate the hazards of the chemicals they produce or import. Using that information, they must prepare labels for containers, and the more detailed MSDS technical bulletins. Chemical manufacturers, importers and distributors of hazardous chemicals are required to provide the appropriate labels and MSDS to the employer to which they ship the chemicals.

34. The MSDS goes on, however, to indicate that a NIOSH approved respirator need only be worn in poorly ventilated areas, if

Threshold Limit Values were exceeded and/or dusty conditions exist. **See Attachment I.**

35. Thus, according to the MSDS for Micore Board, there are three situations which would necessitate the use of respirators when working with Micore Board: (1) in poorly ventilated areas; (2) if Threshold Limit Values are exceeded; or (3) when dusty conditions exist. However, the air quality tests performed by OSHA in the UNICOR factory definitively establish that the UNICOR factory was not poorly-ventilated, that the Threshold Limit Values for hazardous ingredients of Micore Board were not exceeded, and that dusty conditions did not exist. **See Attachments C, E, and I.**

36. In fact, the UNICOR factory at FCI McKean is equipped with two dust collection systems, each consisting of a large dust collectors, an extensive duct work system, fans, vacuums and a waste portal. The dust collectors have been operational in the UNICOR factory at FCI McKean since approximately September 11, 1989, and each of the two dust collectors have the capacity to move 34,000 cubic feet of air per minute from the UNICOR factory.

37. Thus, because the factory utilized a dust-collection system instead of local exhaust, a NIOSH/MSHA-approved respirator was not required. **See Attachment I.**

38. My determination that the respirators were not required to be used in addition to the ventilation system in the UNICOR factory is further supported by the warning label affixed to the Micore product warning label. Specifically, the warning label indicates, "Do not cut with power equipment **unless** a dust collector is used on the equipment or local exhaust is used and a NIOSH/MSHA-approved respirator is worn." **Attachment J is a true and correct copy of the Micore package label.**

39. Nonetheless, if inmate Kelly, or any other inmate, had felt that his safety or health was in jeopardy as a result of his continued assignment in the UNICOR factory, he could have requested a respirator from me or another member of the Safety Department. I maintain a supply of NIOSH approved respirators in my office in order to expeditiously accommodate any such request. Additionally, all inmates are instructed during the Admission and Orientation Program to bring any safety concerns to my attention as soon as possible.

40. I respond to all inmate requests for respiration equipment by providing the requested equipment in an expeditious manner. I have never denied such a request.

41. In the time I have been at FCI McKean, only one UNICOR inmate has ever requested a respirator. That inmate requested a respirator from the Assistant Safety Manager in April 2003. Although there was no identifiable concern with the air quality in the UNICOR factory, the request was honored and records reflect the inmate was provided with a respirator that same day.

42. I am not personally aware of any other inmates, including inmate Kelly, requesting a respirator. If inmate Kelly, or any other inmate, had requested a respirator, I would have provided him with one. The only reason inmate Kelly was not provided with a respirator was that he never requested one.

43. Furthermore, to the best of my knowledge, a correct copy of all MSDS sheets are available in the UNICOR factory. No staff member or inmate has ever indicated to me that the MSDS was materially altered or vandalized. If such a situation had been brought to my attention, I would have replaced it as soon as practicable. I did not, however,

learn that there was any concern with respect to the MSDS sheet until after inmate Kelly filed this lawsuit.

44. Copies of the MSDS sheets are maintained on the UNICOR factory floor so they can be reviewed easily by both staff and inmates. Because these copies are readily available, however, any staff or inmate in the factory could place an unauthorized marking or alteration on an MSDS sheet. Such handwritten alterations to an MSDS sheet are not authorized by myself or anyone else in the institution. Amendments to an MSDS sheet must be received directly from the manufacturer.

45. Again, if any staff or inmate had brought an unauthorized alteration or marking on an MSDS sheet to my attention, I would have removed it from the factory floor and provided a replacement as soon as practicable.

46. Title 28 C.F.R. § 301.101, et seq., requires inmates who sustain work-related injuries/maladies to report them to their work supervisor, who would report the work-related injury/malady to me. With respect to inmate Kelly, I received no such report of a work-related injury/malady.

47. Title 28 C.F.R. § 301.202, requires the Safety Manager to file applications for inmate lost time wages in cases where an inmate must take medical leave due to a work-related malady. In inmate Kelly's case, I filed no lost time wages applications, because there was no indication that he suffered from a work-related debilitation or injury.

I declare under penalty of perjury in accordance with the provisions of 28 U.S.C. § 1746 that the above is accurate to the best of my knowledge and belief.

_____          1·26·2006
Stephen Housler                          Date
Safety Manager
FCI McKean