**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LESLIE R. KELLY,** <br> **Plaintiff,** <br><br> **v.** <br><br> **MARTY SAPKO, et al.,** <br> **Defendants.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **C.A. No. 03-368 Erie** <br> **District Judge McLaughlin** <br> **Magistrate Judge Baxter** |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

## I. RECOMMENDATION

It is respectfully recommended that Defendants' Motion for Summary Judgment, or in the alternative, Motion to Dismiss [Document # 77] be granted.

## II. REPORT

### A. Relevant Procedural History

On March 24, 2004, Plaintiff Leslie R. Kelly, an inmate formerly incarcerated at the Federal Correctional Institution at McKean ("FCI-McKean"), filed a *pro se* civil rights Complaint pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971) and the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. ("FTCA"). Named as Defendants in the original Complaint were: Marty Sapko, UNICOR/Industry Factory Manager at FCI-McKean ("Sapko"); Stephen Housler, Safety Manager at FCI-McKean ("Housler"); and Deborah Forsyth, Chairperson of FCI-McKean's Safety and Health Committee ("Forsyth").[1]

In his Complaint, Plaintiff claimed that Defendants: (i) were deliberately indifferent to his safety and subjected him to cruel and unusual punishment in violation of his Eighth

---

[1] This is one of five separate cases filed by former FCI-McKean inmates challenging conditions at FCI-McKean's UNICOR factory. The Plaintiffs in the other four cases are Michael Hill (C.A. No. 03-323E), Kevin Siggers (C.A. No. 03-355E), Myron Ward (C.A. No. 04-11E), and Kenny Hill (C.A. No. 05-160E). All of these cases remain pending before this Court.

Amendment rights; (ii) violated his due process and equal protection rights under the Fifth Amendment; (iii) violated Title 18 U.S.C. § 1001(a); and (iv) were negligent in failing to enforce Bureau of Prisons' policies and regulations, failing to protect him from known risks of harm, and failing to enforce workplace safety standards as required by the Occupational Safety and Health Act ("OSHA"). (See Complaint at pp. 5-8, 11-12). As a result of these claims, Plaintiff sought injunctive relief and monetary damages.

On August 19, 2004, Defendants filed a motion to dismiss, or in the alternative, for summary judgment [Document #24] claiming that: (i) Plaintiff's claims against Defendants in their official capacities were barred by sovereign immunity; (ii) Plaintiff's negligence claims failed to state constitutional violations actionable under 42 U.S.C. § 1983; (iii) Plaintiff's claim under 18 U.S.C. § 1001(a) failed to state a claim because no private cause of action is authorized by the statute; (iv) Plaintiff's Eighth Amendment rights were not violated; and (v) Plaintiff failed to state a due process or equal protection claim under the Fifth Amendment.

On January 3, 2005, this Court issued a Report and Recommendation recommending dismissal of: (i) Plaintiff's claims against Defendants in their official capacities, based upon sovereign immunity; (ii) Plaintiff's claim pursuant to 18 U.S.C. § 1001(a); (iii) Plaintiff's Fifth Amendment equal protection and procedural due process claims; and (iv) Plaintiff's FTCA claim, based upon Plaintiff's failure to exhaust his administrative remedies. [Document # 34]. However, this Court recommended that Plaintiff's Eighth Amendment and Fifth Amendment substantive due process claims be allowed to proceed. This Report and Recommendation was subsequently adopted by District Judge Sean J. McLaughlin, by Order dated March 31, 2005. [Document # 40].

On April 25, 2005, Plaintiff filed a motion for appointment of counsel, which was granted by this Court on November 30, 2005. [Document # 54]. Plaintiff's newly-appointed counsel then filed an Amended Complaint on January 20, 2006, adding as Defendants the United States of America ("United States") and John J. Lamanna, Warden at FCI-McKean ("Lamanna"). [Document # 55]. In his Amended Complaint, Plaintiff restated his Eighth Amendment deliberate indifference against the individual Defendants, and reinstituted his

FTCA claim against the United States.[2]

In response to the Amended Complaint, and before any additional discovery had been conducted by the parties, Defendants filed another motion to dismiss, or in the alternative motion for summary judgment [Document # 56]. After briefing by the parties, this Court issued a Report and Recommendation, dated July 24, 2006, recommending that Defendants' motion be granted with regard to Plaintiff's reinstated FTCA claim against the United States, and that such claim be dismissed due to Plaintiff's failure to exhaust administrative remedies, but that Defendants' motion be denied with regard to Plaintiff's Eighth Amendment claim against the individual Defendants. [Document # 64]. On August 16, 2006, District Judge Sean J. McLaughlin issued a Memorandum Order adopting this Court's Report and Recommendation and dismissing Plaintiff's FTCA claim against the United States. [Document # 68]. As a result, the only claim remaining in this case is Plaintiff's Eighth Amendment claim against the individual Defendants, alleging that they were deliberately indifferent to his health and safety by exposing him to hazardous working conditions in FCI-McKean's UNICOR factory.

Discovery has now closed in this case, and Defendants have filed a motion for summary judgment, or in the alternative, motion to dismiss [Document # 77], to which Plaintiff has filed a brief in opposition. [Document # 82].[3] This matter is now ripe for consideration.

**B. Relevant Factual History**

From September 3, 2002 to April 25, 2003, Plaintiff was assigned to work in FCI-

---

2 Plaintiff's substantive due process claim was omitted from the Amended Complaint by Plaintiff's counsel, and was, thus, deemed to have been dropped. (See Document # 64, Report and Recommendation, at p. 2 n. 1).

3 The identical motion, briefs, and exhibits have been filed by the parties in each of the five cases referenced in footnote 1. Although these cases have never been consolidated on the docket, they are scheduled to go to trial at the same time, due to the identity of material facts at issue. As a result, this Court will consider the same motion in all five cases, but will do so separately because of differences in the plaintiffs' former work duties, dates of employment, length of exposure to the work environment, and claimed injuries.

McKean's UNICOR factory. (Document # 79, Exhibit A-15).[4] Plaintiff has alleged that he "regularly handled and worked with materials commonly known as Micore board, particleboard or tac-board and worked in and around areas where such boards were being cut, sanded and routered." (Amended Complaint, at ¶ 12). Each Micore board bears a label, which indicates that the board may contain crystalline silica and contains the following warning:

> Dust hazard. Cut and trim with knife, razor, or hand saw. Do not cut with power equipment unless a dust collector is used on the equipment or local exhaust is used and a NIOSH/MSHA-approved respirator is worn. Failure to follow these instructions may result in overexposure to airborne man-made mineral fiber. Airborne man-made mineral fiber and crystalline silica are thought to increase the risk of lung cancer. Overexposure to dust can cause eye, skin, nose, throat or respiratory irritation. Wear eye and skin protection.

(See Document # 57, Exhibit J).

Plaintiff claims that the material safety data sheet maintained by the Defendants with regard to the Micore fiber board was altered, such that the word "respirator" was marked out and replaced with the word "mask." (Amended Complaint at ¶ 21). Moreover, Plaintiff asserts that the factory's exhaust and ventilation systems were insufficient, and the only protection provided by Defendants were disposable "Do it Best" breathe-easy dust masks, which were distributed in packages that each contained the following warning:

> This mask is not suitable for use against toxic or hazardous air contaminants, such as, but not limited to, paint spray mists, asbestos, **silica**, cotton or other toxic dusts, fumes, gases and vapors.

(Document # 27, Exhibit C)(emphasis added).

In addition to working in and around areas where Micore board was being cut, sanded and routered, Plaintiff claims that he and other workers were "regularly instructed to clean machinery and work areas using pneumatic or other compressed air equipment, as well as brooms," thereby exacerbating his exposure to airborne silica dust. (Amended Complaint at ¶ 17). Plaintiff also claims that he "worked in and around areas where the adhesive commonly

---

4

According to Plaintiff's work history, Plaintiff was removed from his UNICOR job on April 25, 2003, "due to chronic management issues and progressive unsatisfactory work performance." (Document # 79, Exhibit A-15 at p. 18).

known as Lockweld 860/861 was being used," which exposed him "to serious risks and hazards including the risk of fire and health risks associated with the presence of fumes from Locweld 860/861." (Amended Complaint at ¶¶ 13, 15).

During his deposition that was taken in this case on October 31, 2006, Plaintiff detailed his job assignments during the eighth months he worked in FCI-McKean's UNICOR factory. In particular, he testified that he was first assigned to work at a glue machine, gluing panel board together, which he did for "about two or three months." (See Transcript of Deposition of Leslie Kelly ("Kelly Deposition") attached as Exhibit A-23 to Document # 79, Defendants' Exhibits, at pp. 4-6). He was then assigned to an assembly job, screwing padding onto Micore boards that were first cut by other inmates using a panel saw that was located about ten feet behind him, and then drilled by another inmate who used a "machine drill" that was located "right beside" him. (Kelly Deposition at pp. 8-10). Plaintiff also alternated between cutting and stacking tac-board, and sweeping. (Kelly Deposition at p. 11).

Plaintiff testified that, during the time he worked in the UNICOR factory, he experienced three or four nose bleeds, "real bad headaches that [lasted] all day long," chest pains, and shortness of breath. (Kelly Deposition at pp. 13-24). He testified that he no longer experiences nose bleeds or severe headaches, but that he still experiences chest pains and shortness of breath "every now and then." (Kelly Deposition at pp. 19-20, 24, 31). Plaintiff also testified that he has subsequently had infections in his neck and nose, for which he has received antibiotics. (Kelly Deposition at pp. 24-25, 31).

On January 16, 2007, Plaintiff was examined by Defendants' medical expert, Gregory J. Fino, M.D., FCCP, who concluded that Plaintiff exhibited "no evidence of any chronic condition of the lungs or pulmonary system related to his alleged exposures,"and "no evidence of a chronic condition with reference to the skin, eyes or nose." (See Report of Gregory J. Fino, M.D., FCCP ("Fino Report"), attached as Exhibit A-1 to Document # 79, Defendants' Exhibits, at p. 48).

**C. Standards of Review**

**1. Motion to Dismiss - Fed.R.Civ.P. 12(b)(6)**

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. Neitzke v. Williams, 490 U.S. 319 (1989); Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000). The motion cannot be granted unless the court is satisfied "that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984). See also Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).

Rule 8(a) of the Federal Rules of Civil Procedure states that a pleading must set forth a claim for relief which contains a short and plain statement of the claim showing that the pleader is entitled to relief. The issue is not whether the plaintiff will prevail at the end but whether he should be entitled to offer evidence in support of his claim. Neitzke v. Williams, 490 U.S. 319 (1989); Scheuer v. Rhodes, 419 U.S. 232 (1974). However, a court need not credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997) citing In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1429-30 (3d Cir.1997). Therefore, in order to survive a motion to dismiss for failure to state a claim, the complaint must only set forth sufficient information to suggest that there is some recognized legal theory upon which relief can be granted. See Swierkiewicz.

**2. Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by

affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990), quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990). The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

## D. DISCUSSION

### 1. Eighth Amendment Claim

Plaintiff asserts that Defendants were deliberately indifferent to his health and safety by exposing him to hazardous working conditions in violation of his Eighth Amendment right to be free from cruel and unusual punishment. In particular, Plaintiff claims that Defendants required him to work in and around areas where Micore fiber boards were being cut, sanded, and routered, and otherwise handled by himself and other inmates without proper ventilation and protective gear. As a result, Plaintiff claims that he was exposed to potential carcinogens contained in the dust from these fiber boards, which was further exacerbated by the required blowing and sweeping of the dust from machinery within the UNICOR facility. In addition, Plaintiff claims that he was exposed to harmful fumes from Locweld 860/861 without proper ventilation or protective gear, and that the presence and use of the contact adhesive constituted a fire hazard.

To succeed on an Eighth Amendment claim based on prison conditions, a plaintiff must show: (i) "he has suffered an objectively, sufficiently serious injury," and (ii) "that prison officials inflicted the injury with deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 834 (1994). The first prong of the Farmer test is an objective one. Plaintiff must demonstrate that he has been incarcerated under conditions posing a substantial risk of serious harm. 511 U.S. at 834. In this context, the Eighth Amendment protects against prison conditions that threaten to cause health problems in the future, not just conditions that cause immediate medical problems. Helling v. McKinney, 509 U.S. 25, 33-34 (1993)(holding that prisoner stated cause of action under Eighth Amendment by alleging that prison officials had, with deliberate indifference, exposed him to levels of environmental tobacco smoke that posed an unreasonable risk of serious damage to his future health). To meet this objective standard, however, "the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the challenged conditions]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary

standards of decency to expose *anyone* unwillingly to such a risk." Helling, 509 U.S. at 36 (emphasis in original).

The second prong of the Farmer test is a subjective one, requiring Plaintiff to demonstrate that Defendants acted with deliberate indifference. To establish deliberate indifference: 1) a prison official must know of and disregard an excessive risk to inmate health or safety; 2) the official must be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and 3) the official must also draw the inference. Farmer, 511 U.S. at 837. Thus, "deliberate indifference describes a state of mind more blameworthy than negligence," and requires "more than ordinary lack of due care for prisoner's interests or safety." Id. at 835 (citations omitted).

In light of the foregoing standards, the pertinent Eighth Amendment inquiry here may be defined as follows: 1) was Plaintiff unwillingly exposed to unreasonably high levels of silica dust that society would consider so grave as to violate contemporary standards of decency?; and, if so, 2) were Defendants aware of facts from which an inference was drawn that a substantial risk of serious harm existed, and did they disregard such facts, such that they were deliberately indifferent to an excessive risk to Plaintiff's health and safety? The burden of proof is heavy for good reason. Defendants' behavior is not held to a simple tort standard, but a constitutional one – cruel and unusual punishment. The fact that the evidence here must rise to the level of a constitutional claim, not a tort, is particularly relevant and daunting.

In this Court's Report and Recommendation, dated July 24, 2006, a review of genuine issues of material fact was made. (See Document # 64 at pp. 7-10). The gist of this review, which was made before discovery was completed or any depositions were held, was that the positive Microbac and OSHA air quality test results in 2001 and 2003, respectively, were not insulating of themselves so as to provide a basis for judgment as a matter of law in favor of Defendants. More was needed by Defendants to combat the charge that Plaintiff was exposed to unreasonably high levels of particulate matter and fumes during the time that he worked in the UNICOR facility, because Plaintiff had called into question the reliability of the test results, the extent of Defendants' knowledge of the conditions in the UNICOR facility, and the potential

dangers that could result from working in that environment. Plaintiff's contentions were also given due deference since Plaintiff was newly-represented by counsel, and pertinent discovery and expert opinions had not yet been obtained. However, this Court felt that more was ultimately needed from Plaintiff, as well, to satisfy the objective and subjective standards, as articulated by the Supreme Court in Helling and Farmer.

With discovery now completed, and expert reports having now been provided, the landscape has changed with regard to Defendants' current motion. With a trial date imminent, it must be determined whether Plaintiff has genuine issues, supported appropriately, that should go to jury determination, considering the concomitant time, effort and expense associated with trial preparation and expert testimony.

**1. Objective Standard**

The responsive evidence presented by Plaintiff to meet the objective prong of Farmer v. Brennan is sparse and unpersuasive. Initially, Plaintiff argues that "Defendants do not dispute that silica dust is a known carcinogen and a cause of serious respiratory ailments and conditions and other health problems." (Document # 82 at p. 3). Plaintiff then cites Defendant Housler's deposition testimony in support of his assertion that "[t]he ventilation system at FCI-McKean's UNICOR facility did not prevent silica dust **in significant amounts** to become airborne." (Id.)(emphasis added). This assertion is inaccurate. Defendant Housler merely testified that, while the "[m]ajority of the dust went into the dust-collecting system," a "**small amount**"of dust would be left in and around the area of operation of the sawing equipment. (Document # 79, Exhibit A-5, at p. 18)(emphasis added).

Finally, Plaintiff attempts to discredit the results of the Microbac and OSHA air sampling tests by submitting a record of monthly tac-board production from January 1, 2000 through December 1, 2005, and arguing that "the production levels on the dates preceding the OSHA inspection and Microbar [sic] testing were substantially less than typical production levels, which necessarily would have skewed the test and inspection results." (Document # 82 at p. 4, and Exhibit A thereto). For instance, Plaintiff argues that, from April 15, 2003 through the

end of June 2003,[5] "no more than 136 tack boards were processed at the UNICOR facility," while "[i]n contrast, 849 tack boards were processed in October 2003 alone." (Document # 82 at p. 4).[6] This comparison does nothing to discredit OSHA's air test results, however, because the relevant benchmark for comparison is the production levels that occurred in the months **preceding** the OSHA test, since this was the time period during which the OSHA complaint was generated. Looking back at the year preceding April 2003, the production record indicates that, from April 2002 through December 2002, the average monthly production level was approximately 130 boards.[7] (Document # 82, Exhibit A at p. 2). This monthly average is not significantly different from the production of 121 boards in April 2003. As a result, the production record does little, if anything, to support Plaintiff's attempt to discredit the OSHA air test results.

In short, Plaintiff has provided no evidence, scientific studies, or expert reports, that would indicate that "significant amounts" of silica dust remained airborne, despite the presence of the dust-collecting system installed in the UNICOR factory. Moreover, Plaintiff has failed to produce any scientific studies or expert reports explaining in detail the level of concentration and the duration of exposure to silica dust and/or Locweld 860/861 that would be necessary to

---

5 The OSHA air testing was performed on June 17 and 18, 2003.

6 The Court notes from the production record that 121 boards were processed in April 2003, approximately 71 were processed in May 2003, and 65 were processed in June 2003. (Document # 82, Exhibit A at p. 2). Nevertheless, it appears that Plaintiff counted only May and June's production in making his claim that "no more than 136 tack boards were processed" from April 15, 2003 through the end of June 2003. Plaintiff has provided no explanation for excluding April's production from his calculation.

7 The record indicates that there were no boards produced during the months of February and March 2003, while only 2 boards were produced in January 2003. This Court chose to exclude the monthly production of 2 boards in January 2003, so that the calculation would not be skewed against Plaintiff.

create an unreasonably high risk of harm.[8] As a result, the Court has very little more than that which was discussed in the Report and Recommendation filed before discovery was accomplished.

Nonetheless, even if this Court were to assume, for argument's sake, that there was an unreasonably high level of silica dust (or exposure to Lokweld fumes) in the UNICOR facility, Plaintiff must still show that he was exposed to such conditions **unwillingly**. See Helling, 509 U.S. at 35 (plaintiff "must also establish that it is contrary to current standards of decency for anyone to be so exposed **against his will**...) (emphasis added); Farmer, 511 U.S. at 837 ("[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments'"). This he cannot do. It has now become clear from deposition testimony and the work manual that Plaintiff was in a job that he was hired for – a job that was not forced upon him. Unlike second-hand smoke cases, such as Helling, which involved prisoners placed in positions with no choice but to be exposed to dangerous environmental tobacco smoke ("ETS"), Plaintiff here **chose** to work in the UNICOR facility. Plaintiff testified to the "very heavy fumes" he had inhaled from working around the glue machine, which, he believed, caused him to experience severe headaches, nose bleeds, chest pains, and shortness of breath; yet, he still **chose** to work there. The record evidence establishes that these jobs were coveted for both the fulfilling nature of the work and for the substantial salary paid to the prisoners in comparison to other prison jobs. (See transcript of deposition of Kevin Siggers attached as Exhibit A-26 to Document # 79, Defendants' Exhibits, at p. 45; UNICOR McKean Familiarization Handbook attached as Exhibit A-11 to Document # 79, Defendants' Exhibits, at pp. 36-45). These jobs were not assigned in a prison "chain gang" manner; rather, there was an elaborate system for acquiring the jobs and for advancement within the UNICOR system. (See UNICOR McKean Familiarization Handbook attached as Exhibit A-11 to Document # 79, Defendants' Exhibits, at

---

[8] Although Plaintiff has provided the expert report of David R. Williams, Certified Industrial Hygienist, the report makes only general observations, such as the OSHA permissible exposure limit for dust containing 20% crystalline silica would be 0.46 $mg/m^3$, without rendering an opinion as to whether the OSHA results indicated an exposure in excess of this limit. (See Exhibit attached to Document # 84, at ¶ 2).

pp. 36-45).

One case outside of this Circuit is particularly on point: Wooten v. Goord, 2004 WL 816919 (W.D.N.Y. March 25, 2004), aff'd., 2005 WL 387971 (2nd Cir. Feb. 17, 2005). In Wooten, inmate employees complained of health risks associated with the dust, fumes, noise and chemicals used in a print shop at the institution. While the district court found that the conditions did not rise to the level of seriousness necessary for a constitutional violation because the complaining prisoners either suffered no injuries or *de minimus* ones[9], the appellate court affirmed solely on the fact that the prisoners **chose** to work in the print shop. Id. at p.2 ("[I]nmates are free to choose where they work"). Although the Second Circuit refused to establish a "voluntariness" factor as a bright line test, it held that "the minor health problems already experienced by plaintiffs-e.g. headaches, nausea, skin irritation-do not give rise to constitutional concerns in a context where the plaintiff inmates knowingly and voluntarily subject themselves to the conditions causing those problems." Id., 2005 WL 387971 at p. 3. See also Christopher v. Buss, 384 F.3d 879, 882-83 (7th Cir. 2004), quoting Haas v. Weiner, 765 F.2d 123, 124 (8th Cir. 1985)("'conduct in which one voluntarily engages can hardly be said to violate the Eighth Amendment.'"). Cf. Bagola v. Kindt, 131 F.3d 632, 645 n.18 (7th Cir. 1997)(voluntary participation not dispositive if cruel and unusual punishment shown).

Based on the foregoing, this Court finds that Plaintiff has failed to meet the objective standard of Farmer v. Brennan and, thus, his Eighth Amendment claim should be dismissed as a matter of law.

---

9

Defendants spend much time reviewing the results of medical examinations of the Plaintiffs by Gregory J. Fino, MD, FCCP. Those examinations found that none of the Plaintiffs had silicosis or any other occupationally-acquired abnormality. Plaintiffs have not submitted conflicting results or objections to Dr. Fino's findings from their own expert because of time constraints. (See Document # 82, Plaintiff's, Brief, at p. 19 n. 1). In any event, this Court's analysis does not and should not rest solely on any "actual injury" of the complaining inmate. Helling, 509 U.S. at 33 (holding that unreasonable risk of serious damage to future health sufficient to state a cause of action under the Eighth Amendment).

**2. Subjective Standard**

Alternatively, even if it could be determined that Plaintiff was unwillingly exposed to a serious health risk, there is no evidence that Defendants were deliberately indifferent to the situation. At all times relevant to this action, FCI-McKean's UNICOR factory was equipped with two separate dust collection systems, which had been operational since approximately September 11, 1989. (See Declaration of Martin Sapko ("Sapko Declaration"), attached to Document # 57, at ¶ 7, and Exhibit C attached thereto). Each dust collection system was installed with its own separate duct work, which was attached to approximately half of the equipment in the factory. (See Declaration of Michael Salerno ("Salerno Declaration"), attached to Document # 79, at ¶¶ 5, 7). The dust collectors created a vacuum at the work surface of each piece of equipment, so that dust would be drawn away from the worker, instead of toward the worker. (Salerno Declaration at ¶ 6). Dust and air entering the dust collection system were moved by fans through smooth round ducts from the machinery process to a large vacuum located outside of the factory. (Sapko Declaration at ¶ 10). The vacuum pulled the dust and air from the factory into one of two large cone-shaped filter houses, where the dust was filtered from the air and evacuated into a hopper, which was also located outside of the factory. (Id.). The filtered air was then returned to the factory through square ducts. (Id.).

Each of the two dust collection systems was strong enough to move 34,000 cubic feet of air per minute from the UNICOR factory. (Sapko Declaration at ¶ 7; Salerno Declaration at ¶ 8). System number one collected dust from eight machines, which required a total of only 9,900 cubic feet of air per minute, while system number two collected dust from fifteen machines that required a total of only 13,100 cubic feet of air per minute. (Salerno Declaration at ¶ 8). Thus, each system had the capacity to remove an amount of airborne particulates significantly in excess of that which was required by the equipment that was located within the UNICOR facility.

In addition to the elaborate dust collection system installed in the factory, coveralls were made available to wear over prisoners' clothing to protect their skin from the dust, and dust masks were also made available. (See Housler Deposition at pp. 20, 24-25; Sapko Deposition at

pp. 12, 17; transcript of deposition of David English ("English Deposition")attached as Exhibit A-7 to Document # 79, Defendants' Exhibits, at pp. 25-27, 34, 58; transcript of deposition of Debra Forsyth ("Forsyth Deposition") attached as Exhibit A-8 to Document # 79, Defendants' Exhibits, at p. 26; Siggers Deposition at pp. 15-16, 31, 62; K. Hill Deposition at pp. 25-27). Moreover, when Defendants were given information to make the shop a safer place by OSHA inspectors, they implemented all of OSHA's recommendations without question, even though such recommendations were merely considered suggestions and were not the result of any findings or test results that would require correction. (See Housler Deposition at pp. 55, 57-58; Sapko Deposition at pp. 29-30; Siggers Deposition at pp. 62-63). None of these actions can be said to be the actions of a deliberately indifferent prison staff imposing cruel and unusual punishment upon Plaintiff.

Furthermore, there is no evidence of record establishing that Defendants were either aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, or that they, in fact, drew such an inference. Farmer, 511 U.S. at 837. To the contrary, the deposition testimony would indicate otherwise. The most revealing evidence regarding Defendants' collective state of mind was elicited from Defendant Housler during his deposition. In particular, Defendant Housler readily admitted that he was not aware of any potential health hazards associated with the dust created by the cutting of Micore board, during the following exchange:

> Q. For a convenience [sic] time reference here, let me just direct you to the period prior to the OSHA inspection, which I think commenced on or about April 16th, 2003. And let me ask you, prior to that OSHA inspection, what did you know about Micore board? Personally.
>
> A. Personally? I – I knew that it – it did create some dust. I didn't – I didn't know a whole lot about it. I did review the Material Safety Data Sheet. I saw no issues, really, with it.
>
> Q. So you knew that when the material was handled – for example, when it was sawed, it would fracture the material, obviously, and create dust?
>
> A. Create small amounts of dust, yes.
>
> Q. And did you know the composition or constituent parts of that

dust?

A. No.

* * *

Q. That's all right. Did you know that the dust included Silica dust?

A. No.

* * *

Q. But what you did know is that cutting or sawing would release some sort of dust in the vicinity of the operator.

A. Yes. Some dust is released anytime you do any type of cutting.

* * *

Q. Sure. Prior to the commencement of the OSHA inspection on April 16, 2003, what did you know about the potential health effects or hazards created by the dust generated by the cutting of Micore board?

A. I didn't really know of many health hazards associated with it. I don't know.

Q. Did you know of any health hazards associated with it?

A. No.

Q. Did you know whether any materials in the dust were a potential carcinogen?

A. Hum-um.

Q. That's a no?

A. No.

Q. Did you know that the dust could cause silicosis?

A. No.

Q. Did you know whether the dust could cause autoimmune diseases?

A. No.

Q. Did you know whether the dust could cause skin irritation?

A. No.

Q. Respiratory dysfunction?

A. No.

(Housler Deposition at pp. 14-16).

Because Defendant Housler was FCI-McKean's Safety Manager and was responsible for training staff and inmates regarding health and safety issues, his professed lack of knowledge regarding any health hazard related to the dust produced from Micore board carried over to the foremen and other staff charged with overseeing the UNICOR facility, as evidenced by the following deposition testimony:

Q. What responsibility, if any, do you have relative to the supervisors at the UNICOR facility?

A. We have annual training every year, and I train them on different safety issues, and they are required to train – attend that.

Q. So you would be the principal source of their training in-house as far as the procedures and materials in use at UNICOR?

A. Correct.

Q. Now, would it be accurate to say that you did not provide any training to any inmates regarding any potential health hazards associated with Micore board?

A. That's correct.

Q. And the same would be true relative to supervisors at the UNICOR facility. You did not provide any training to those individuals regarding potential health hazards associated with Micore board.

A. Correct.

Q. All right. And that would necessarily be true because at least with respect to the MSDS sheet, you hadn't reviewed it, at least prior to the OSHA inspection.

A. Correct.

(Housler Deposition at p. 21). This testimony was essentially corroborated by Defendant Sapko UNICOR Factory Manager, during his deposition:

Q. All right. Prior to OSHA's inspection, which I believe commenced in or around April of 2003, what did you know about Micore board?

A. Probably not a lot of it.

Q. Did you receive any training regarding the composition of

Micore board?

A. No.

* * *

Q. Did you know that silica dust was a by-product of Micore board prior to the OSHA inspection?

A. No.

(Sapko Deposition at pp. 13, 16).

It is apparent from the foregoing deposition testimony that supervisors and staff at FCI-McKean's UNICOR facility were unaware of any potential health hazards associated with the dust created by cutting Micore board prior to the OSHA inspection that commenced in April 2003. It may be argued that this lack of awareness was due to their failure to pay attention, their ignorance, or their failure to acquaint themselves with all of the safety materials available to them. The reason, however, is unimportant. While it may be true that "[a]n act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation, ... an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment." Farmer, 511 U.S. at 837-38.

Furthermore, the Microbac air tests that were conducted on July 31, 2001, informed Defendants that the air quality within the UNICOR facility was well within the permissible limits established by OSHA. (See Housler Declaration attached as Exhibit 17 to Document # 57, at ¶¶ 12-13). As a result, Defendants did not make any inference that a potential health hazard existed in the UNICOR facility. This latter point is illustrated by the fact that none of the UNICOR supervisors or staff wore masks or respirators. (See Housler Deposition at pp. 23; English Deposition at p. 59; Forsyth Deposition at p. 37; Siggers Deposition at pp. 57-58). Thus, by their own actions, Defendants displayed no knowledge or concern regarding any potential health hazard associated with the dust produced from Micore board. In short, the deposition testimony in this case clearly demonstrates that Defendants were not **deliberately**

**indifferent** and, thus, no Eighth Amendment violation can be shown.

Based on the foregoing, this Court finds that Plaintiff has failed to satisfy the subjective standard of Farmer v. Brennan, as well and, thus, his Eighth Amendment claim should be dismissed as a matter of law.

## III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendants' Motion for Summary Judgment, or in the alternative, Motion to Dismiss [Document # 77] be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

S/Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief U.S. Magistrate Judge

Dated: February 23, 2007

cc: The Honorable Sean J. McLaughlin
United States District Judge