IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL HILL, et al., | ) | |
| Plaintiffs | ) | CIVIL ACTION NO. 03-323 ERIE |
| | ) | CIVIL ACTION NO. 03-355 ERIE |
| v. | ) | CIVIL ACTION NO. 03-368 ERIE |
| | ) | CIVIL ACTION NO. 04-11  ERIE |
| JOHN LAMANNA, et al., | ) | CIVIL ACTION NO. 05-160 ERIE |
| Defendants | ) | |

<u>EVIDENTIARY HEARING</u>

Proceedings held before the HONORABLE SEAN J. McLAUGHLIN, U.S. District Judge, in Judge's Chambers, U.S. Courthouse, Erie, Pennsylvania, on Monday, March 12, 2007.

APPEARANCES:

RICHARD A. LANZILLO, Esquire, (via Phone), appearing on behalf of the Plaintiffs.

MICHAEL C. COLVILLE, Assistant United States Attorney, (via Phone), appearing on behalf of the Defendants.

DOUGLAS S. GOLDRING, Assistant General Counsel, (via Phone), appearing on behalf of the Federal Bureau of Prisons.

Ronald J. Bench, RMR - Official Court Reporter

1           P R O C E E D I N G S
2
3           (Whereupon, the proceedings began at 2:30 p.m., on
4   Monday, March 12, 2007, in Judge's Chambers.)
5
6           THE COURT:  Who do we have on the line?
7           MR. LANZILLO:  Your Honor, this is Rich Lanzillo.
8           MR. COLVILLE:  Mike Colville here.
9           THE COURT:  Who else do we have?
10          MR. COLVILLE:  We have Doug Goldring from the BOP.
11  Then we have Robert Grieser from BOP Industries.  Doug?
12          MR. GOLDRING:  I'm here.
13          MR. COLVILLE:  Robert?
14          MR. GRIESER:  Yes.
15          MR. COLVILLE:  If you could introduce yourself to
16  Judge McLaughlin?
17          MR. GRIESER:  Yes, sir.  My name is Robert Grieser,
18  I'm Chief Administrative Officer for Federal Prison Industries.
19          THE COURT:  Sir, how do you spell your last name?
20          MR. GRIESER:  G-r-i-e-s-e-r.
21          THE COURT:  All right.  As I said, I guess it was on
22  Friday, this was going to be the day that I set aside a bit of
23  time for what essentially is just a brief evidentiary hearing,
24  so I can hear testimony that might be relevant on the
25  spoliation contention by the defendant.  At this time Mr.

1  Grieser, I'm going to swear you in.  I would ask that you raise
2  your right hand.
3            ROBERT GRIESER, DEFENSE WITNESS, SWORN
4            THE COURT:  All right, Mr. Goldring, you can take
5  over.
6            MR. GOLDRING:  Thank you, your Honor.
7                      DIRECT EXAMINATION
8  BY MR. GOLDRING:
9  Q.    Mr. Grieser, you've already stated your current
10 employment; can you state who your employer is?
11 A.    Federal Prison Industries.
12 Q.    And how long have you held your current position?
13 A.    Since 1993.
14 Q.    And can you just give the court a brief overview of what
15 your responsibilities are in that position?
16 A.    My responsibilities include all of the planning,
17 operation, the research, analyst functions, as well as at that
18 time oversight of all of the activation of new factories and
19 mission changes.  Which involve deactivation of one industry
20 and replace it with another line of business.
21 Q.    When you talk about the activation and deactivation,
22 would that include the factory at FCI-McKean?
23 A.    It would.
24 Q.    Are you familiar with the products or services they
25 currently are making?

4

1   A.   I am.
2   Q.   What exactly do they currently make at that factory?
3   A.   We are currently involved in plastics, the manufacture of
4   plastic items.
5   Q.   How long have you been making plastic items at that
6   factory?
7   A.   Probably since about the fall of 2005. September,
8   October timeframe of 2005.
9   Q.   And what was made at that factory prior to that time?
10  A.   We made office furniture, work surfaces.
11  Q.   How long were you making office furniture at that
12  factory?
13  A.   I believe since its inception.
14  Q.   Do you live recall when its inception was?
15  A.   Might have been about 1989, 1990, when that was first
16  activated.
17  Q.   Were you involved in the decision-making process to
18  switch that factory from furniture to plastics?
19  A.   I was.
20  Q.   Can you remember approximately when that decision was
21  made?
22  A.   Yes, exactly. The letter, formal decision letter was
23  issued on July 27, 2005.
24  Q.   And do you recall who that letter came from?
25  A.   That came from Steve Schwab, Chief Operating Officer, and

1   went to the Regional Director in the Northeast region.
2   Q.    Was anybody else involved in that situation?
3   A.    Yes, the general managers -- for the business group,
4   office furniture group, as well as the business group in which
5   plastics comes under. And, of course, the deputy to Mr. Schwab
6   and myself, had the responsibility with activation.
7   Q.    Do you recall the reasons that the decision to convert
8   that factory was made?
9   A.    Yes, I do. The factory was converted for a couple of
10  reasons. The first reason is that the market, our market in
11  the office furniture business line was shrinking and has been
12  shrinking for a number of years. And so over the past few
13  years, beginning probably in '04 and a year prior to that, we
14  closed down a number of office furniture factories and/or
15  converted them to alternative lines of business in service
16  areas and other industries, in this case plastics. Over the
17  last couple years we converted our institutions at Texarkana,
18  Texas. Lompoc, California. Schuylkill, Pennsylvania.
19  Morgantown, West Virginia. And Dublin, California. So there
20  were a number of instances where we were actually trying to
21  consolidate the office furniture because we needed to be
22  profitable, the factories that we have that manufacture
23  furniture, to be self-sustaining. And we did not have the work
24  to support it, to continue to support McKean. At the same time
25  the Bureau of Prisons has been growing and activating a number

1  of installations and new factories.  One of them at the time
2  was down in a federal complex in Coleman, Florida.  We already
3  have a large systems furniture complex at two of our
4  institutions.  We have a business furniture factory.  The
5  McKean factory actually supplied work surfaces for Coleman,
6  which they would then ship down to Coleman and then incorporate
7  that into the finished product that would ultimately go to the
8  customer.  We opened a new penitentiary at Coleman, and with
9  insufficient work at McKean and then the shipping costs and all
10 that, the decision was made that we would consolidate that work
11 that was currently being done at McKean, move that work that
12 was remaining to the new complex at Coleman.  And just convert
13 the factory at McKean to plastics.  The plastics, we only had
14 one factory doing plastics down in Beaumont, Texas, where we
15 make helmets for the military.  We were talking about having a
16 backup, a secondary operation, and we thought plastics gave us
17 more of an opportunity to grow and expand, get into new
18 products.  So that was why the decision, in essence, was made
19 to convert at that time.
20 Q.    At any time prior to the issuance of the decision letter
21 that you mentioned, was anybody from the institutional level or
22 the factory involved in the decision-making process?
23 A.    No, they were not.
24 Q.    At any time, to the best of your recollection, during
25 your deliberation or decision-making about whether to convert

1  the factory, was any mention made of a lawsuit pending
2  regarding this factory?
3  A.    No, it was not.
4  Q.    To the best of your knowledge, did you have any knowledge
5  at all that there was a lawsuit pending regarding this factory?
6  A.    I had none whatsoever.
7           MR. GOLDRING:  That's all the questions I have, your
8  Honor.
9           THE COURT:  Who is going to be cross-examining on
10 behalf of the plaintiffs?
11          MR. LANZILLO:  Richard Lanzillo, your Honor.
12          THE COURT:  Go ahead, Mr. Lanzillo.
13                      CROSS-EXAMINATION
14 BY MR. LANZILLO:
15 Q.    Mr. Grieser, as I understand your testimony, the actual
16 conversion of the facility from furniture to making plastics
17 occurred in September of 2005, is that right?
18 A.    Yes, that it had actually occurred.  It takes a few
19 months.  Once we close out the furniture, they may still have
20 had their last furniture orders around September, October.  And
21 we had to do whatever we needed to do to convert the factory
22 and get it ready for plastics.  It may have been more towards
23 December, January, when we actually did our first plastics.
24 But it was in that first quarter of the fiscal year 2006, I
25 guess it would be.

1  Q.    So there was a transition phase from furniture to
2  plastics, correct?
3  A.    Absolutely.
4  Q.    All right.  And going back to your testimony on the
5  determination to change the facility from furniture to
6  plastics, that came in the form of a written decision on July
7  27, 2005?
8  A.    Yes.
9  Q.    And to whom would that decision have been delivered?
10 A.    It goes to, our standing operating procedure is it goes
11 from Mr. Schwab, our Assistant Director, to the Regional
12 Director of the Bureau of Prisons, with a copy to the warden at
13 that institution.
14 Q.    Right.  And so on or about July 27, 2005, at least a
15 couple of months before even the transition from a furniture
16 manufacturing process to the plastics manufacturing process,
17 that information would have been conveyed to Warden Lamanna at
18 the McKean facility, is that right?
19 A.    Yes.
20 Q.    At that point, once Warden Lamanna was advised, do you
21 have any reason to believe that Warden Lamanna apprised you or
22 anyone else in your office of the pendency of at least four
23 litigation matters, four lawsuits concerning safety conditions
24 at the furniture manufacturing facility?
25 A.    I apologize, could you repeat that question, I'm sorry.

1  Q.    Did Warden Lamanna tell you, to your knowledge, or anyone
2  else associated with your office, that there were four
3  lawsuits, at least four lawsuits, perhaps five, already pending
4  concerning working and safety conditions at the furniture
5  manufacturing facility in McKean after Warden Lamanna learned
6  that the furniture manufacturing facility was going to be
7  shutdown and replaced with a plastics facility?
8  A.    Right, no, I had no knowledge of that.  I'm looking at
9  the cc on the letter, I'm showing a different warden there at
10 the time.
11 Q.    Who do you show?
12 A.    Warden Sherman.
13 Q.    Okay.  Did anyone from McKean advise you of the pendency
14 of any lawsuits?
15 A.    No.  I was not advised, no, sir.
16 Q.    Now, after the decision was made to convert the facility
17 from furniture manufacturing to plastics, would there have been
18 any site visits where the personnel would come and look at that
19 facility and talk about the logistics of making the conversion?
20 A.    There was a site visit.  It may have been in the late
21 September timeframe or sometime in that vicinity.  I was not
22 there myself on that visit.  But there were some folks that,
23 the technical people that talk about what needs to be done to
24 remove whatever dust collection or feed rail and put in
25 whatever appropriate lines to support the plastics equipment

1    that was going in.
2    Q.    All right.  And would it be fair to conclude that as part
3    of that site visit, your personnel would have met with the
4    technical personnel at McKean to discuss those very topics you
5    just mentioned, removal of existing equipment, including the
6    dust removal system and replacing it with the equipment
7    necessary for plastics?
8    A.    Yes, that would be fair.
9    Q.    For example, I would expect that your personnel would
10   want to meet with someone like the safety manager, Stephen
11   Housler, and personnel of that nature?
12   A.    I'm not sure they would have necessarily met with the
13   safety manager.  That's possible.  But they would -- typically,
14   that communication would come through the associate warden,
15   superintendent of industries at the institution locally.  They
16   might have just done a walk-through with the factory manager at
17   the time.  They could have met with him, but I wouldn't be
18   certain they would meet with the safety manager.
19   Q.    The superintendent of industries and the plant manager at
20   that time, do you know the identity of those individuals?
21   A.    Earl Doughty is the superintendent of industries.  I
22   cannot recall who the plant manager was.
23   Q.    And then once the transition, once the modifications
24   necessary to transform the plant from a furniture manufacturing
25   facility into a plastics plant began, that would have consumed

1   at least a few months, correct?
2   A.    Yes.
3   Q.    And I assume that type of a change is fairly open and
4   obvious; you're changing out old equipment and installing new
5   equipment, is that fair?
6   A.    Very much so, yes.
7   Q.    And, to your knowledge, at no time during that process
8   did anyone associated with the facility raise the fact that
9   there were pending lawsuits concerning the condition, the
10   working conditions at that furniture manufacturing facility, is
11   that correct?
12   A.    That is correct.
13   Q.    When did you learn that this lawsuit was pending
14   concerning the working conditions at that facility?
15   A.    Actually, I learned it as of Friday, last Friday, when
16   Mr. Goldring asked me to comment on the transition and the
17   decision to convert the factory.
18          MR. LANZILLO:  That's all I have.
19          THE COURT:  Mr. Goldring, do you have anything
20   further?
21          MR. GOLDRING:  Nothing further, your Honor.
22          THE COURT:  All right.  Mr. Lanzillo, is there
23   anything you want to say by way of a brief summary on this
24   separate issue?
25          MR. LANZILLO:  The knowledge within the Bureau of

1   Prisons that this plant was going to be converted, I think is
2   attributable to all those involved in the process.  This
3   certainly came at a point in time when it was no secret, as of
4   July 27, 2005, that there was going to be a conversion.  As of
5   that date, that notice should have been provided to the
6   plaintiffs, an opportunity to conduct a reasonable inspection
7   prior to conversion should have been provided to the
8   plaintiffs.  I don't believe that one hand necessarily knew,
9   did not know what the other hand was doing is a valid grounds
10  or a valid basis for allowing the disassembly and destruction
11  of evidence that was obviously relevant.
12              THE COURT:  Thank you.  Mr. Colville.
13              MR. COLVILLE:  We disagree, your Honor, about the
14  notice.  According to the witness's statement, it took months
15  for the conversion to take place.  These plaintiffs would have
16  had notice at that point.  Beyond that, your Honor, this is a
17  <u>Bivens</u> case.  The defendants have chosen to sue people
18  individually.  And with that comes their burden to prove that
19  the individuals had some involvement with this decision in the
20  first place.  Some bad intent or fraud in a covering up or
21  allowing this to spoil.  I don't think there's any evidence of
22  that in this case.
23              THE COURT:  All right.  Having heard the testimony
24  of Mr. Grieser, and being cognizant of the requirements for a
25  finding of spoliation, rather, the considerations, specifically

1   the degree of fault of the party who allegedly altered or
2   destroyed the evidence; the degree of prejudice suffered by the
3   opposition party; and whether there is a lesser sanction that
4   would will avoid substantial unfairness to the opposing party
5   and, where the offending party is seriously at fault, will
6   serve to deter such conduct by others.  That is Schmid v.
7   Milwaukee Electric Tool Corp., 13 F.3d 76 (3rd Cir. 1994), at
8   page 79.
9           And, further, the law in this circuit is also
10  well-established that, and I'm quoting now from Brewer v.
11  Quaker State Oil Refining Corp., 72 F.3d 326 (3rd Cir. 1995):
12          "Such a presumption or inference arises, however,
13          only when the spoliation or destruction of evidence
14          was intentional, and indicates fraud and a desire to
15          suppress the truth, and it does not arise where the
16          destruction was a matter of routine with no
17          fraudulent intent."  Brewer at 334.
18          Based upon the testimony of Mr. Grieser, I find on
19  this record absolutely no evidence of intentional or fraudulent
20  conduct perpetrated with a desire to suppress the truth, in
21  connection with the conversion of this facility from a wood
22  making facility to a plastics factory.  The evidence suggests
23  that the decision was made by the higher-ups and the decision
24  was made solely and exclusively for what appears to be
25  legitimate economic reasons.

1        All right, we'll be getting something out in the
2   immediate future relative to the extent R and R.  Thank you
3   very much, counsel.
4        MR. COLVILLE:  Thank you, your Honor.
5        MR. LANZILLO:  Thank you, your Honor.
6
7        (Whereupon, at 2:52 p.m., the proceedings were
8   concluded.
9
10                          - - -

C E R T I F I C A T E

    I, Ronald J. Bench, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____
Ronald J. Bench